FILED _____ ENTERED
_____ LODGED _____ RECEIVED

JUN 1 2 2017

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ZIMMERMAN MARINE, INC., \*
\*
Plaintiff, \*
\*
v. \* Civil Case No. JFM-15-2945
\*
M/V ROTTEN KIDS, *et al.*, \*
\*
Defendants \*

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Zimmerman Marine, Inc. ("ZMI") filed this action *in rem* to foreclose two maritime liens against a defendant vessel, M/V "Rotten Kids," owned by Defendant John Verde, Sr. ("Verde, Sr."). [ECF No. 1]. ZMI also asserts contractual and quasi-contractual claims against Verde, Sr. and his son, John Verde, Jr. (collectively "Defendants" with M/V "Rotten Kids"). *Id.* Verde, Sr. filed a counterclaim against ZMI, alleging breach of contract, breach of warranty of workmanlike performance, negligence/bailment, and wrongful arrest. [ECF No. 19]. Presently pending before the Court are Defendants' Motion for Summary Judgment [ECF No. 39] and ZMI's Cross-Motion for Partial Summary Judgment [ECF No. 41]. The motions are fully briefed, and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the reasons set forth below, both motions will be **DENIED**.

I. **BACKGROUND**

Verde, Sr. owns M/V Rotten Kids, a 2005 52' Ocean Yachts Super Sport ("the vessel"). *See* Verde, Sr. Aff., [ECF No. 39-4 at ¶1]. In late 2012, the vessel sustained damage while in dry storage at a marina. *Id.* In March, 2013, Eric Greene, a naval architect, provided a report

1

outlining the damage and the scope of needed repairs. Verde, Sr. Dep., [ECF No. 39-5 at 15, 31]. After obtaining estimates from multiple facilities, Verde Sr. chose ZMI to repair the vessel. *Id.* at 29-31.

ZMI prepared a proposal ("Proposal") containing an itemized list of the work to be performed and the price per line item. Verde, Sr. Dep., [ECF No. 39-5 at 38-41, 74]; Zimmerman Dep., [ECF No. 39-6 at 23, 37]. The parties negotiated some changes to the Proposal, and also exchanged and negotiated a two page "Agreement for Repairs to Vessel" ("the Agreement"). Verde, Sr. Dep., [ECF No. 39-5 at 38-41]; Zimmerman Dep., [ECF No. 39-6 at 23]; [ECF No. 39-7, 2-3]. On April 11, 2014, Steve Zimmerman, the president of ZMI, ("Zimmerman"), and Verde, Sr. accepted and signed the Proposal and the Agreement. [ECF No. 39-7]. The parties agree that those two documents constituted the contract for repairs of the vessel ("the Contract").

Several provisions of the Contract are especially relevant to the instant dispute. First, the parties agreed on a quote of $136,450.00 for the itemized work in the Proposal. [ECF No. 39-7, 1]. Second, the parties agreed that:

> Invoices for respective repairs completed will be sent and payments required only at 50% repair completion and at 100% (repair completed). . . . Zimmerman Marine shall provide a lien release and waiver at each progressive and final payment. At no point may Zimmerman Marine or Zimmerman Marine's agents confiscate, hold, not allow launching of Customer's vessel, or not allow access within reasonable business hours to Customer's vessel.

*Id.* at 2-3. However, the contract also provides that, "All invoices must be paid in full prior to departure of vessel." *Id.* at 1. The parties further acknowledged that, when ZMI began work on the vessel, it would likely discover additional damage requiring repair. The parties agreed on a procedure to handle such findings. "Given the extent of the damage and the limitations of non-destructive testing, it is assumed that there will be additional findings not included in the scope

2

of this estimate. Where such findings are discovered, ZMI will notify the [sic] Mr. Verde before proceeding. Such work, when approved, will be identified as 'supplemental' and will be invoiced (sic) separately." *Id.* at 1.

Verde, Sr. paid the agreed deposit, and ZMI commenced the itemized repairs to the vessel. On September 30, 2014, Zimmerman emailed Verde, Sr. and asserted that the project was over 50% complete, since the estimate was for 650 man hours of labor and ZMI had expended 401 man hours. [ECF No. 39-9]. In an email on October 3, 2014, Verde contested ZMI's method of calculating completion, and instead asserted that "the totaling of the line item completions (reasonable percentage completed times the total cost of that line item) divided by the complete project total cost will be used to determine the percentage of repair completion. Using this method it's been determined that the project is at 36% repair completion." [ECF No. 39-6, 22]. To resolve the dispute, Verde, Sr. agreed to modify the terms of the Contract to add progress payments at 36% and 75% completion. *Id.* Zimmerman responded in an email stating,

> We are in agreement with the revised payment schedule of 36%/50%/75%/100%. . . For the record, I do not agree that we are only 36% complete, but did not see that as a reason to withhold the release. By my calculations we are more than 50% complete, and I agreed to your calculation in exchange for your offer to add a payment at 75%.

*Id.* at 21.

On October 3, 2014, Zimmerman signed a document entitled, "Partial Release of lien – Material and Labor" ("Partial Release of Lien") providing:

> As described in this partial release of lien Zimmerman Marine has for the consideration of the payment of $52,709.00 completed all the requirements up to the 36% stage of completion . . . The undersigned hereby releases, waives, indemnifies and discharges Owner from all claims, demands, all present and/or future liens, rights of lien and lien and/or payment or performance bond claims of any kind whatsoever undersigned has, or might have, under any present or future law, for any work done or labor or materials furnished in connection with the Owner or Owner's Property.

*Id.* at 24. In exchange for the Partial Release of Lien, Verde, Sr. paid ZMI 36% of the Contract price, minus the amount of the deposit already paid. [ECF No. 39-6, 22].

Following the October modification to the Contract and the partial payment, ZMI provided Verde, Sr. with a proposal for the supplemental work that would be required to complete the repairs to the vessel ("the Supplemental Proposal"). [ECF No. 39-10, 12-18]. Verde, Sr. did not approve the Supplemental Proposal because he did not agree with the new proposed payment terms, but he did approve a few line items of supplemental work. Verde, Sr. Dep., [ECF Nos. 39-5 at 75; 41-9 at 72-73; 41-14 at 68-69]; Zimmerman Dep., [ECF No. 39-6 at 58, 82]. While the parties negotiated the Supplemental Proposal, ZMI continued to repair the vessel under the original Contract. The project manager at ZMI, Kip Koolage, sent Verde, Sr. a spreadsheet on or about December 3, 2014, with what Koolage determined to be the status of completed Contract work. [ECF No. 39-6, 33-37]. On that spreadsheet, Koolage also noted when supplemental work had to be completed before an item could be finished. *Id.* On or about January 8, 2015, ZMI requested another progress payment and provided an updated spreadsheet. *Id.* at 38-41.

On February 16, 2015, Zimmerman emailed Verde Sr. to state,

> I have been searching for a way to bridge the gap between your definition of % complete and my definition. No question that we both agree that our contract spells out payment based on % of completion, but we were both negligent in defining that standard . . . To date I have deferred to your definition, but that is becoming increasingly difficult and onerous . . . The bottom line from the above is that we are at 70% completion of the labor, plus the materials and subs paid. Our agreement calls for payment at 75%, but we are unable to get to 75% because of the discoveries and supplemental quotes. . . There is some work that I could 'force' Kip to complete so that I could make the number come to 75%, but that does not serve the best interests of you or the boat.

*Id.* at 26-27.

4

On March 22, 2015, Verde, Sr. emailed Zimmerman and agreed to pay $6371.00 for transmission work, with the remainder to be paid when the work was done. [ECF No. 39-11]. Although the subcontractor performed its portion of the work, according to Verde, Sr., ZMI did not complete its portion. [ECF Nos. 39-6, 31-32 & 66; 39-8, 7].

The labor logs suggest that ZMI stopped working on the vessel on March 24, 2015, just after the subcontractor completed its work on the transmission. [ECF No. 39-6, 43-67]. On March 24, 2015, Zimmerman stated that ZMI ~~stated that it~~ had "completed 73% of the labor hours." [ECF No. 39-5, 25]. On March 28, 2015, Verde countered that ZMI was at 45 percent completion and that the percentage of labor hours "doesn't mean anything." [ECF No. 39-6, 29].

On March 31, 2015, Zimmerman emailed Verde, Sr. stating that the parties "disagree on the definition of 'percentage of completion'" but that "ZMI remains committed to fulfilling that contract." [ECF No. 39-5, 23]. Zimmerman noted "a sizeable amount of work that is not included in that contract" and stated that the supplemental work gave the parties "an opportunity to correct the vague definition we used in the contract so that we can focus on doing the work, and not arguing over payments." *Id.* Zimmerman also stated, "If we cannot agree on a clearer set of terms, then we should agree to disagree and talk about how to unwind and settle up. That will be challenging too, because we will have to be paid for labor and materials expended on your behalf, yet not reaching a % complete threshold." *Id.*

On April 7, 2015, Verde Sr. sent Zimmerman a "Notice of Default." [ECF No. 39-12]. The next day, the parties exchanged emails. Verde, Sr. took the position that ZMI was in default of the contract, and that Verde, Sr. could not agree to a modification of payment terms for the supplemental work. [ECF No. 39-5, 22-23]. Zimmerman responded that "the project is being

5

terminated[,]" and that ZMI would implement a lien until Verde Sr. and Zimmerman could work out a final accounting. *Id.* at 22.

On April 13, 2015, Zimmerman sent Verde Sr. a spreadsheet in which he color coded tasks that had already been completed, tasks that could be completed without approval of any supplemental work, and tasks that could not be completed without approval of supplemental work. [ECF No. 39-6, 31-32]. According to that spreadsheet, Verde Sr. owed a balance of $21,011.21 for work performed under the Contract. *Id.* at 32.

On April 14, 2015, ZMI filed a Notice of Claim of Lien with the United States Coast Guard seeking $21,011.21 for materials and labor provided to the vessel under the Contract. [ECF No. 39-13, 3-4]. On April 30, 2015, ZMI filed a second Notice of Claim of Lien seeking $6,046.60 for its share of the transmission work. *Id.* at 5-6. ZMI's counsel notified Verde Sr. of the liens by letter on June 25, 2015. *Id.* at 1-2.

On July 6, 2015, ZMI's attorney notified Verde, Sr. that ZMI planned to sell the vessel under Maryland Commercial Code § 16-207 at a public auction to satisfy its liens. [ECF No. 39-14]. Verde Sr. objected to the sale, citing the Contract's provision that, "'At no point may Zimmerman Marine or Zimmerman Marine's agent confiscate, hold, not allow launching of Customer's vessel, or not allow access within reasonable business hours to Customer's vessel.'" [ECF No. 39-15, 1]. However, ZMI's broker scheduled a public auction of the vessel on August 14, 2015. [ECF No. 39-16].

To stop the auction, Verde Sr. filed a replevin action in the District Court of Maryland for Anne Arundel County. [ECF No. 39-17]. The hearing was set for September 29, 2015. *Id.* The day before that hearing, ZMI filed its complaint in this Court for federal arrest of the vessel. [ECF No. 1]. ZMI's counsel then sent a letter to notify Verde Sr.'s counsel that it would

6

relinquish possession of the vessel and move it out of its facility. [ECF No. 39-19]. In that letter, ZMI did not mention the federal arrest complaint. After Verde Sr. dismissed his replevin action, this Court issued the warrant for arrest *in rem*, and the vessel was arrested and returned to ZMI's shop. [ECF No. 8]. On October 13, 2015, Verde, Sr. posted security to obtain release of the vessel. *See* [ECF No. 16]. This action followed, in which ZMI filed a verified complaint *in rem* to foreclose on its two maritime liens (and filed *in personam* claims against Verde Sr. and Verde Jr.), and Verde Sr. filed several counterclaims.[1]

## II. STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* When reviewing a motion for summary judgment, the court must take all facts and inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

While the party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323

---

[1] Verde, Sr. originally took the position that the factual allegations in the counterclaim should be deemed admitted by ZMI and summary judgment should be granted in its entirety, since ZMI never filed an answer to the counterclaim. Def.'s Mot., [ECF No. 39-1, 30-32]. However, on January 13, 2017, this Court granted ZMI's motion to file a late answer and the answer was filed. [ECF Nos. 46, 47]. Thus, the allegations in the counterclaim will not be deemed admitted for the purposes of the instant motions.

7

(1986), the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). The non-movant "'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970). A court should enter summary judgment when a party fails to make a showing sufficient to establish elements essential to a party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

In this case, admiralty law applies because the claims arise out of a contract for repairs of a vessel. *Norfolk S. RR v. Kirby*, 543 U.S. 14, 24 (2004). If maritime law does not answer a legal issue, courts sitting in admiralty may apply state law, unless it conflicts with maritime principles. *See Sea Byte Inc. v. Hudson Marine Management Svc.*, 565 F.3d 1293, 1298 (11th Cir. 2009); *Wells v. Liddy*, 186 F.3d 505, 524–25 (4th Cir. 1999).

## III. DISCUSSION

### A. Contract Claims/Percentage of Completion

Both parties seek summary judgment on their contract-based claims, which rely on competing theories of percentage of completion. The parties' contract provides no definition of "repair completion," and is therefore ambiguous. In admiralty cases, ambiguous contractual language is construed "most strongly against the drafter." *Krzywicki v. Tidewater Equipment Co., Inc.*, 600 F. Supp. 629, 640 (D. Md. 1985) (citing *Navieros Oceanikos, S.A. v. S.T. Mobil Trader*, 554 F.2d 43, 47 (2nd Cir. 1977) (internal quotations omitted)). Here, however, the

identity of the drafter of the relevant provision has not been established, and even resort to extrinsic evidence does not suggest that the parties ever agreed upon a definition of repair completion.

Essentially, ZMI believes it completed more than 50% of the work, and Verde, Sr. believes ZMI completed less than 50% of the work. Each side has pointed to spreadsheets and testimony which, in its view, support its position. This issue, therefore, presents a quintessential genuine dispute of material fact. Although Verde, Sr. contends that ZMI agreed to use his method of calculating completion, the correspondence simply does not corroborate that assertion. Zimmerman stated, several times, that he understood how Verde Sr. was reaching his conclusions, but never agreed to adopt Verde, Sr.'s method on an ongoing basis. *See, e.g.,* [ECF No. 39-6, 21] ("For the record, I do not agree that we are only 36% complete . . . [b]y my calculations we are more than 50% complete"). In particular, the email from Zimmerman to Verde, Sr. that stated that ZMI's work was "yet not reaching a % complete threshold" does not indicate an agreement that ZMI had not yet met the 50% threshold, in light of the evidence suggesting that Zimmerman believed ZMI to be working towards the 75% threshold. *See* [ECF No. 39-5, 23].

Verde, Sr. contends that ZMI could have continued to do work to get past the next level of completion by Verde Sr.'s calculation. Def.'s Mot., [39-1, 12-13]. However, given the fact that the parties disagree on the appropriate calculation of completion, the fact that additional work could have been performed may prove irrelevant to an assessment of whether ZMI had a right to a payment due and validly asserted liens on the vessel. In addition, both parties seem to concur that the entire contract could not have been completed without ZMI being authorized to

9

do the supplemental work. The effect of the impossibility on the viability of the contract, and the point, if any, when the contract became impossible to complete, will be determined at trial.

## B. Validity/Enforceability of Lien

Preliminarily, as noted above, the issues of whether Verde, Sr. was in breach of his payment obligations and the amount of any payment he owed are not amenable to summary judgment at this stage. The parties submitted evidence, in the form of spreadsheets and excerpts from deposition testimony, pertaining to the status of ZMI's work on several different line items. However, the record does not clearly establish that either Verde, Sr. or ZMI is entitled to judgment as a matter of law as to any of the individual line items. Trial will likely involve a painstaking assessment of the precise work done on each line item.

Verde, Sr.'s contention that there was an express lien waiver is similarly deficient, at least at the summary judgment stage. There is a "very strong" presumption against waiver of a maritime lien. *See Ryan-Walsh, Inc. v. M/V Ocean Trader*, 930 F. Supp. 210, 220 (D. Md. 1996). The October 3, 2014 document entitled "Partial Release of Lien" expressly refers to "work done or labor or materials furnished" in the past tense. [ECF No. 39-6, 24]. Even if the Partial Release of Lien were believed to be ambiguous, in the context of the parties' contract, it is clearly intended to be one of the anticipated "lien release and waiver[s] at each progressive and final payment." [ECF No. 39-7, 2]. If the Partial Release of Lien were meant to be a full release of lien, there would have been no need to require additional releases and waivers at each future payment. As a matter of contractual interpretation, then, the Partial Release of Lien did not constitute a full release.

Verde, Sr. also submits that ZMI waived its lien rights in the original contract, specifically the language promising not to "confiscate, hold, not allow launching of Customer's

10

vessel, or not allow access within reasonable business hours." *Id.* At best, however, the contract contains contradictory language about whether ZMI could hold the vessel if payment were not rendered, since it also provides, "All invoices must be paid in full prior to departure of vessel." *Id.* at 1. The contract therefore does not clearly establish a lien waiver. Moreover, even if holding the vessel were to be a breach of the contractual language, because there is a factual dispute about whether Verde, Sr. first breached the contract by failing to pay monies owed, summary judgment would be inappropriate.

Finally, calculation of appropriate lien amount, if any, like the remainder of issues discussed above, is not suited for summary judgment. The parties' factual disputes about the percentage completion, the individual tasks completed, and the value of the work performed renders summary judgment inappropriate.

### C. Quasi-Contract Claims

The parties do not cite, and this Court did not find, any maritime cases assessing the interplay between contractual claims and quasi-contractual claims. Under Maryland law, ZMI's quasi-contract claims, including *quantum meruit* and unjust enrichment, would not be viable if there is an express contract governing the parties' obligations to one another. *See FLF, Inc. v. World Publications, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998). For the reasons discussed above, there is some question whether the parties' contract is viable, given the ambiguities in the agreement and the chance that the contract, at some point, was rendered impossible to perform. Accordingly, summary judgment on ZMI's quasi-contractual claims is inappropriate as to either party.

## D. Breach of Warranty of Workmanlike Performance/Negligence

ZMI alleges that it is entitled to summary judgment on Verde, Sr.'s claims for breach of warranty of workmanlike performance and negligence, since Verde, Sr. has no expert witness to establish the standard of workmanlike performance or the standard of care for negligence. Pl.'s Mot., [ECF No. 41-2, 21 & 27-29]. However, in combination, the admissions from ZMI's project manager, Koolage, regarding defects in the portside gelcoat and the report from Verde, Sr.'s expert, Clark Lutz, create a genuine issue of material fact as to whether a breach of workmanlike performance can be established. Thus, summary judgment is unwarranted.

## E. False Arrest

ZMI contends that summary judgment should be denied as to Verde, Sr.'s claim for false arrest of the vessel because there is no evidence to establish the required element of "bad faith, malice, or gross negligence." *Id.* at 18. Although such intent evidence is somewhat scarce on the present record, viewed in the light most favorable to Verde, Sr., the timing of ZMI's actions to return the vessel in order to moot the replevin case, combined with the lack of notification to Verde, Sr. of the pending federal arrest, creates a genuine factual dispute regarding ZMI's intent. Accordingly, I cannot hold that the requisite intent was lacking as a matter of law.

## V. CONCLUSION

For the reasons set forth above, both parties' motions for summary judgment [ECF Nos. 39, 41] are denied. A separate Order follows.

Dated: 6/12/17

/s/
J. Frederick Motz
United States District Judge